# DAVID T. BONNELL

## *v.*

# WILLIAM SMITH *et al.*

1. HOMESTEAD—*of the occupancy required.* In December, 1862, a party, the head of a family, purchased a tract of land, and in February, 1863, went into possession, moving with his family into a house on the premises, then also being occupied by his grantor. The families occupied the house together about a week, during which time the purchaser built a shanty on the same premises and moved into it with his family, and remained there until his grantor left the house, during the same month, when the purchaser moved back into the house. About three days after they moved back into the house, the wife of the purchaser left him, in consequence of his abuse of her, and did not return, he remaining in the house a short time afterwards, having no other home, and in April set out an orchard, boarding at a neighbor's while doing so. During the summer of 1863 the premises were occupied by his tenant, and in October of that year his wife obtained a decree of divorce, and these premises were decreed to her as alimony. It was *held*, the purchaser had a homestead right in the premises, until it became transferred to his wife.

2. SAME—*transfer of homestead right from the husband to his divorced wife.* Where the wife of a party having a homestead right, obtains a divorce from him, she being the meritorious cause thereof, and the custody of their child being committed to her, she becomes the head of the family, and the homestead right passes to her as such, by operation of the statute.

3. SAME—*effect of absence of the wife prior to the divorce.* In this case the wife left her home by reason of ill treatment by her husband, between the middle of the month of February and the middle of March, and on the twenty-fourth of the latter month filed her bill for divorce, the decree for divorce being entered in the following October, she, in the meantime, remaining away from the homestead, at her father's: *Held,* the wife did not forfeit her homestead right, as against a judgment creditor of the husband, by such absence. She being the meritorious cause of the divorce, and the custody of her child being committed to her, the benefit of the homestead likewise enured to her. She may be said to have left it under a moral compulsion, at least, and by decreeing it to her as alimony, she was thereby rehabilitated to it.

4. SAME—*effect of the death of the divorced wife, her child surviving.* The death of the wife after the divorce, in such case, would not operate to destroy the homestead right, her child still being alive, because the statute secured it to the child until he should attain the age of twenty-one years.

5. SAME—*of a judgment lien on a homestead—right of sale in the debtor.* After the owner of a homestead had executed a mortgage on the land, but without releasing the homestead right, a judgment was recovered against him: *Held,* the homestead right could be afterwards sold to and vested in the mortgagee, free from any lien of the judgment.

WRIT OF ERROR to the Alton City Court; the Hon. HENRY S. BAKER, Judge, presiding.

This was an action of ejectment brought by Bonnell against Smith, and afterwards Joshua Neely was also made a defendant. Bonnell claims title under a judgment recovered in April, 1863, against Philip English, and one of the questions presented is, whether English had a homestead right in the premises. The circumstances connected with their occupancy, appear from the following testimony:

Defendant called *Bridges,* a witness, who testified he knew Philip, and Laura English, his wife; Laura is dead; witness lived near the premises in controversy; that Philip English and his wife moved in the old house on premises in controversy, in January, 1863; Paris Harville was occupying a part

of the same also; they stayed there about one week, keeping house while there; while there, Philip built a shanty for himself and his wife to live in, on the premises in controversy, about thirty feet from the old house, and moved into the shanty until Harville gave them possession of the old house entirely, by moving out of it, when Philip moved into the old house; Philip English did not own any other place; witness thought that Paris Harville left the premises in February, 1863; that Philip English and his wife lived in the old house, on the premises in controversy, after Harville left; witness passed along the road frequently, while Philip and wife were living there; Harville had a wife and children also; Philip and wife did not live together long after Harville moved out; witness could not state precisely when it was that Harville moved out of the house; Philip and wife occupied the premises from some time in January, 1863, to the spring of the year, some two months; English was there setting out an orchard on the place in April, 1863; it was his homestead in 1863.

On cross-examination: Witness stated that the shanty was built on the southwest corner of the premises in controversy, some thirty feet from the old house on same; some time in the fore part of March, 1863, and previously, English and wife lived there; they separated some time in the middle of March, 1863, and she never afterward came back to live with her husband; English was back and forth on the place during the summer; Jacob Harville lived there after Philip left, as his tenant.

On re-examination, the witness stated he was certain that Laura English lived on the premises in controversy, after the first of March, 1863; they moved there about the first of January, 1863, and lived there till the middle of March, 1863; he was there frequently after Mrs. English left.

Defendant then proved, by *Alex. Sinclair*, that Philip English lived on the premises in controversy, but when, he could not say; it was some time after Harville sold out to English, that he lived there in the same house that Harville lived in;

he built a shanty on the premises and lived there until Harville left, and then moved into the old house on the place; English stayed there some time after his wife left him; it was in the spring, can not say what time, he kept "batch" in the old house.

On cross-examination, witness stated that he did not recollect when English went to the premises, or when he left, or how long he was there.

The plaintiff then called *Paris Harville,* a witness, who was sworn, and testified he sold the premises in controversy to Philip English, on the twenty-ninth of December, 1862; gave him the possession on the twentieth day of February, 1863; he built the shanty, which was about thirty feet off from the old house witness was living in; the shanty was erected on the premises; after it was completed, English and wife moved into the shanty and kept house; English left the shanty and moved into the old house when witness left it; Mrs. English left him about the fifteenth day of February, 1863; witness was there after she left and went to her father's; she did not live with him after; she left him five days before witness left the place; English left the place on the tenth of March, 1863, and went to Grafton.

On cross-examination, by defendant, witness testified that English did not, to his knowledge, live on the premises in controversy, after he left; he did not see him there in April; he rented to B. F. Harville, for one year, the place in controversy, and he lived there under English; witness lived three-quarters of a mile west of the place; in January, 1863, he moved in the house witness was living in; witness was to give him possession on the first of March, 1863; English and his wife lived with him, in the old house, one week about the first of January.

Plaintiff then introduced *Richard Quinn,* who being duly sworn, testified that he lived within one-fourth to one-eighth of a mile of the premises in controversy; Philip English and

his wife, Laura, went to the premises about the first of January, 1863; Mrs. English left him once and then came back again, and then she left again and was only gone a few days, then came back and stayed together a short time, when she left the last time, in the last of February, 1863, when she left for good; in the first place, they went into the house with Harville, and English then built a shanty, and he and his wife went into that; after that they moved into the old house on the place, that is, after Harville left it; she left him about three days after Harville left; about the last of March, 1863, English left and went to Grafton; he came back with some fruit trees, and set them on the place in controversy, and boarded with witness while doing so; in April he gave the mortgage; the same day he came back, witness purchased his furniture of him; after his wife left him, he brought his things to witness' house, and left them there when he went to Grafton; witness afterwards bought them.

On cross-examination, by defendant, witness stated that English came with the trees in April, 1863; he boarded with witness while setting them out.

The other facts in the case, are presented in the opinion of the court.

Mr. Seth T. Sawyer, for the plaintiff in error.

Messrs. Warren & Pogue, for the defendants in error.

Mr. Chief Justice Breese delivered the opinion of the Court:

This was an action of ejectment, brought to the Jersey Circuit court by David T. Bonnell, against William Smith and Joshua Neely, to recover the possession of twenty-three acres of land, part of the southeast quarter of section twenty-three, in township eight, north range twelve, west, and particularly described in the declaration, by metes and bounds, courses and

distances.   By consent, the venue was changed to the city court of Alton, and a trial there had by the court, resulting in a verdict for the defendants.

To reverse this judgment, the plaintiff brings the record here by writ of error.

It appears by the record, that one Harville, who, it is agreed, was seized in fee of the land, on the twenty-ninth of December, 1862, sold and conveyed by deed of that date, to Philip English, the premises in controversy, together with the south half of southwest quarter of the same section.   On the second of April, 1863, English executed his notes and a mortgage of these lands, his wife not joining therein, to one Dempsey, which was duly recorded.   On the twenty-first of April, 1863, Bonnell recovered a judgment in the circuit court of Jersey county, against English, for fourteen hundred and seventeen dollars and fifty cents, on which an execution issued on the fifth day of May, 1863, on which the sheriff made about one hundred and forty dollars, by the sale of personal property, and so returned the writ.   Dempsey, on the twenty-fifth of August, 1863, assigned English's notes and mortgage to William Shephard, who, on the twenty-fifth of January, 1864, assigned the same to Joshua Neely, the defendant.

Philip English married his wife, Laura, on the twenty-ninth day of January, 1861.   On the twenty-fourth day of March, 1863, Laura filed her bill in the circuit court of Jersey county, against her husband, Philip English, for a divorce and for alimony, and such proceedings were had in the cause, that, at the October, term, 1863, it was decreed that the bands of matrimony should be dissolved, the custody of the child committed to the mother, and the land above described, being incumbered by a mortgage to secure the payment of about twenty-five hundred dollars, was adjudged and decreed to the wife, Laura English, as alimony, and for the support of herself and infant child.

It was further decreed, that in case the defendant did not make a deed for the land to complainant, in ten days, then the

master in chancery should make such deed, conveying to the complainant all the defendant's interest in the same. This deed was made by the master in chancery, and delivered to Laura English on the seventh day of December, 1863, and duly recorded.

To the April term, 1864, Joshua Neely, to whom the mortgage had been assigned, brought his bill against Philip English, to have the mortgage foreclosed, and a decree of foreclosure was duly passed. To this bill, Bonnell being a judgment creditor of English, was made a defendant, neither he nor English making any defense. A sale was made of the premises at public auction, in pursuance of the decree, in separate parcels, and the same were stricken off to Neely, and a certificate thereof delivered to him.

On the coming in of the master's report, Philip English filed objections to its confirmation, for the reason that at the time the mortgage was executed, the premises were his homestead, and the same was not released, nor was it set off to him at the time of the sale. The court allowed the objection, and set the sale aside.

At the October term, 1865, on suggestion to the court, appraisers were appointed by the master in chancery to appraise and set off the homestead in the premises, and the appraisers reported that they had set off to Philip English and Laura English, as their homestead, the twenty-three acre tract in the southeast quarter, on which was their dwelling house, which report the master duly made to the court, and the same was confirmed.

While Shephard was the owner of the notes and mortgage executed by Philip English to Dempsey, he, on the seventh day of December, 1863, obtained a deed from Laura English for the expressed consideration of six hundred and fifty dollars, of the twenty-three acre tract in the southeast quarter, and of the south half of the southwest quarter, which was duly acknowledged and recorded. On the eighteenth of January, 1864, Shephard obtained a like deed from Philip English, of

these lands; in both these deeds the requirements of the law were observed in relation to the release of a homestead right. On the twenty-fifth of January, 1864, Shephard, by deed of that date, conveyed the premises to Neely, the defendant.

Bonnell, the plaintiff, claimed title to the premises by virtue of his judgment, execution and sale under it, and a sheriff's deed executed to him. The execution under which the premises were sold, was issued February 12, 1864, and the sale took place May 5, 1864. The sheriff's deed was dated August 26, 1865, to Bonnell, as the purchaser.

These are substantially the facts in the case, and the question arising on them, is, had Philip English or Laura English a homestead right in this tract of twenty-three acres?

It appears, by the proof in the cause, that the mortgage from Philip English to Dempsey, was the first lien on this land, only subject to the homestead right, it having been executed some days prior to the rendition of the judgment against English, in favor of Bonnell.

It further appears, that English and wife lived on these premises in January, 1863, in the old house of which Harville, their grantor, occupied a part; that English built another house, or shanty, as it is called, about thirty feet from the old house, and on the same tract, in which English lived some time with his family, until Harville moved out of the old house, when English moved into it, and had no other home but these premises. English and his wife did not live together very long after moving into the old house. English set out an orchard upon it in April, 1863.

There can be no doubt whatever that this twenty-three acre tract was the homestead of English—he had no other home.

The decree of the circuit court, dissolving the bands of matrimony between him and his wife, allotted this tract of land to Laura for alimony. She, therefore, held it in a double right, as alimony, by a decree of the court, and as her homestead, by operation of the statute.

But it is insisted, as she voluntarily left her homestead, to reside elsewhere, she forfeited the right.

In this feature of the case it is not unlike that of *Vanzant* v. *Vanzant*, 23 Ill. 536. The wife in that case had left the premises, in consequence of ill treatment by her husband, but this court said, as she was the meritorious cause of the divorce, and the head of the family, the custody of the children having been committed to her, the benefit of the homestead would enure to her. So, in this case, the wife was the meritorious cause of the divorce, the custody of the child was committed to her, the benefit of the homestead should likewise enure to her. She may be said to have left it under a moral compulsion, at least, and by decreeing it to her as alimony, she was thereby rehabilitated to it. *Redfern* v. *Redfern*, 38 ib. 509.

At the time of this decree, Bonnell had no lien upon the land—that did not accrue until afterwards, and there was no incumbrance upon it except Dempsey's mortgage, and to that she was not a party.

But, it is said, Laura English is now dead, and therefore her homestead right is gone. But her child is living, and by the statute, the right is secured to him until he shall become twenty-one years of age, and that would prevent the plaintiff from recovering the possession—that, in contemplation of law, is still in this infant.

But as regards the decree of the court allotting these premises to her as alimony, by that decree she became their absolute owner, subject only to such liens as may have existed against them at the time of the decree. Of this nature was the Dempsey mortgage, and as the holders of that are also holders by deed from Laura and Philip English, of all their interest in the premises, another obstacle is created to a recovery by the plaintiff.

But if this was not so—if the husband continued the owner of the homestead, it not having been released by the mortgage, and notwithstanding the decree of the court allotting it to his

wife as alimony, it was not subject to sale under Bonnell's execution. English himself would be entitled to hold it and to sell it, which he has done, even though there was a judgment lien upon it. This is settled by this court in the case of *Green* v. *Marks et al.* 25 Ill. 221.

In whatever light we regard this case, it is apparent, the action of ejectment being a possessory action, the plaintiff had not, when he instituted his action, a right to the possession of these premises, and the city court, in so deciding, administered the law of the case, and its judgment must be affirmed.

*Judgment affirmed.*